UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────────────

UNITED STATES OF AMERICA,

                         Plaintiff,

        v.

JESSIE McINTYRE,

                         Defendant.
───────────────────────────────────────────────

REPORT & RECOMMENDATION

07-CR-6174L

## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer United States District Judge, dated May 8, 2008, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

On October 23, 2007, the grand jury returned a two-count indictment charging defendant Jessie McIntyre ("McIntyre") with narcotics offenses. (Docket # 1). Count One charges him with possession with intent to distribute five kilograms or more of cocaine on October 3, 2007, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A); Count Two charges him with conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. (*Id.*). The indictment was sealed upon its filing and remained sealed until McIntyre's arrest on December 24, 2015. (Docket ## 1, 3).

Currently pending before the Court is a motion by McIntyre to dismiss the indictment on speedy trial grounds, as to which an evidentiary hearing was held. (Docket ## 21,

35, 36, 38, 39).[1] For the reasons discussed below, I recommend that the district court deny McIntyre's dismissal motion.

## **FACTUAL BACKGROUND**

Carlton Smith ("Smith"), a deputy employed by the United States Marshals Service ("USMS") in Rochester, New York, provided testimony and an affidavit in connection with this matter. (Tr. A 7-10; Tr. B 4-89; Government's Exhibit ("G. Ex.") 2).[2] According to Smith, McIntyre was wanted in connection with an incident that had occurred on October 3, 2007, and on October 4, 2007, the USMS was delegated the responsibility of trying to find McIntyre. (Tr. B 4, 6). At that time, Deputy United States Marshal Christopher Pfohl ("Pfohl") was assigned primary responsibility for locating McIntyre. (Tr. B 83; G. Ex. 2 at ¶ 4).

When Pfohl first received the case, two supervised release violation warrants had been issued and were outstanding for McIntyre relating to two prior federal convictions. (Tr. B 6, 9; G. Ex. 2 at ¶ 4). These warrants were entered in the National Crime Information Center ("NCIC") database, a database available to federal, state, and local law enforcement agencies that provides criminal history information to assist in apprehending fugitives. (Tr. B 24; G. Ex. 2 at ¶ 4). On October 16, 2017, Pfohl checked various databases to determine whether he could obtain any new information on McIntyre. (Tr. B 13; G. Ex. 2 at ¶ 5).

Smith explained that by entering McIntyre's warrant and FBI identification number into NCIC, the Marshals Service expected to be contacted by any local or state law

---

[1] Defendant filed omnibus motions seeking other forms of relief, namely, *Brady* material, discovery and inspection, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, a Rule 12(b)(4) notice, leave to file additional motions, and leave to file motions out of time. (Docket # 21). Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on October 19, 2016. (Docket ## 30, 31).

[2] The transcript of the November 29, 2016 hearing shall be referred to as "Tr. A __," and the transcript of the continuation of the hearing on November 30, 2016 shall be referred to as "Tr. B __." (Docket ## 38, 39).

enforcement agency that arrested McIntyre. (Tr. B 54-56). Although Smith's affidavit indicated that the October 24, 2007 arrest warrant issued on the indictment in this matter was also entered into the NCIC database, he clarified during his testimony that only the supervised release warrants had been entered and that they remained pending in the system until McIntyre's arrest. (Tr. A 8-9; Tr. B 70-71).

Shortly after receiving responsibility for the case, Pfohl was informed by the prosecutor that he had received information that McIntyre was living with his mother in Alabama. (Tr. B 10-12). On October 17, 2007, Pfohl pursued this information by contacting the USMS Gulf Coast Regional Fugitive Task Force and requesting that they go to the Alabama address to look for McIntyre. (Tr. B 12-13; G. Ex. 2 at ¶ 5). Approximately one week later, the USMS Gulf Coast Regional Fugitive Task Force informed Pfohl that McIntyre had not been located at the address. (*Id.*).

Smith became involved in the McIntyre investigation in early 2008 and assumed primary responsibility for the investigation that year. (Tr. B 13, 83; G. Ex. 2 at ¶ 6). On March 4, 2008, he received information from an investigator with the Rochester Police Department ("RPD") relating to McIntyre. (Tr. B 15-17; G. Ex. 2 at ¶ 6; Defendant's Exhibit ("D. Ex.") 2). The following day, Smith conducted background checks relating to McIntyre and his associates based upon the information supplied by the RPD investigator and identified some names and contact information for persons believed to be associated with McIntyre. (Tr. B 16-18). On March 6, 2008, the Drug Enforcement Administration ("DEA") provided a new telephone number for one of the identified associates. (Tr. B 17-18). Smith's file did not reflect any additional activities undertaken with this information. (Tr. B 18-19).

On May 1, 2008, Smith was advised by a DEA agent that he had learned information from a confidential informant suggesting that McIntyre had returned to the Rochester area. (Tr. B 19-20; G. Ex. 2 at ¶ 6). Smith believes that the DEA and the USMS conducted surveillance at a location in Rochester where they believed McIntyre was staying, although his notes do not record that surveillance. (Tr. B 20-21).

Approximately six weeks later, on July 16, 2008, Smith performed additional database checks relating to McIntyre. (Tr. B 22; G. Ex. 2 at ¶ 6). According to Smith, database research may include information on a variety of subjects relating to a person, including his or her date of birth, public records, associates, and property or automobiles owned by the individual or their associates. (Tr. B 23-25).

In November 2008, Smith conducted interviews with sources and also checked the "JABS" database for any new pedigree information, such as fingerprints, addresses, photographs, or tattoos associated with McIntyre. (Tr. B 25-27; G. Ex. 2 at ¶ 6). At some point in 2008, Smith also participated in surveillance at 1946 East Main Street, Rochester, New York, based upon intelligence he had received relating to McIntyre's whereabouts. (Tr. B 27-28; G. Ex. 2 at ¶ 6). Smith could not recall the specific date of the surveillance, but testified that it was not successful in locating McIntyre. (*Id.*).

In 2009, Smith received information concerning a vehicle that McIntyre might have been using and obtained a printout relating to McIntyre from the Warrant Information Network ("WIN"), although he was unable to recall the reason he accessed WIN database. (Tr. B 29-30; G. Ex. 2 at ¶ 6). In August 2009, Smith performed another database check relating to McIntyre. (*Id.*).

In 2010, Smith periodically conducted database checks relating to McIntyre and his family; he also interviewed a witness, although he was unable to recall the subject or content of the interview.[3] (Tr. B 30-32; G. Ex. 2 at ¶ 6). Smith testified that the interview did not result in McIntyre's arrest, and he could not recall whether it led to any additional investigative efforts. (*Id.*). Throughout 2011, Smith continued his periodic review of databases for information relating to McIntyre, his family, and his associates. (Tr. B 33-34; G. Ex. 2 at ¶ 6).

In August 2012, information about McIntyre was provided to and aired on the television show "Crime Stoppers"; as a result, Smith received a tip that McIntyre might be located in Haines City, Florida. (Tr. B 34; G. Ex. 2 at ¶ 6). Smith contacted the USMS Florida Regional Fugitive Task Force and asked them to investigate the tip. (*Id.*). On August 22, 2012, the Task Force responded that they conducted surveillance on and searched the location, but did not find McIntyre. (*Id.*).

In August and September 2012, Smith also communicated with DEA agents and local Florida law enforcement officers about information from a confidential informant in Florida concerning McIntyre. (Tr. B 34-36; D. Ex. 2). Smith learned from another confidential source in Rochester, New York that McIntyre might have been living in Alabama. (Tr. B 37-38; G. Ex. 2 at ¶ 6). On September 27, 2012, he re-contacted the USMS Gulf Coast Regional Fugitive Task Force and asked them to attempt to locate McIntyre at his mother's address in Alabama. (*Id.*). McIntyre was not located at that address. (*Id.*).

In October 2012, Smith obtained a court order permitting him to obtain records from a third-party's telephone. (Tr. B 38-39; G. Ex. 2 at ¶ 6). Those records were received and reviewed in November 2012, but did not lead to the arrest of McIntyre. (Tr. B 39, 79).

---

[3] Smith's case notes suggest that the witness informed him that McIntyre was associated with two individuals. (D. Ex. 2).

5

On December 3, 2012, Smith conducted a search for rap sheet information in the "WIN JDIS" database for NCIC. (Tr. B 42-43; G. Ex. 2 at ¶ 6). Smith entered McIntyre's name and date of birth into the database. (Tr. B 46-47; D. Ex. 3). Although the search produced records for an individual with the same name as McIntyre, Smith subsequently learned that the records related to someone else. (Tr. B 47-48). Later in December, Smith conducted additional database checks relating to a possible associate of McIntyre's and reviewed additional telephone records that had been received. (G. Ex. 2 at ¶ 6).

In January 2013, Smith received information suggesting that McIntyre might be located in Phenix City, Alabama. (Tr. B 39-41, 57; G. Ex. 2 at ¶ 6). A few days later, on January 16, 2013, he received information that McIntyre was located at his mother's house in Alabama. (*Id.*). He contacted the USMS Gulf Coast Regional Fugitive Task Force and asked them to investigate both locations, but McIntyre was not located either place. (*Id.*).

Smith conducted additional research to locate rap sheet information for McIntyre on April 5, 2013. (Tr. B 48-49, 75-76; D. Ex. 4). Using the known FBI number associated with McIntyre, Smith obtained information suggesting that McIntyre had been arrested using the alias "Lester Lamarr Kinder" in Clayton County, Georgia in December 2009. (*Id.*). Smith testified that he was not sure whether he had conducted database searches using McIntyre's FBI number before April 2013.[4] (Tr. B 53-54).

According to Smith, because McIntyre's warrant and FBI number had been entered into NCIC in 2007, he had expected to be notified in the event that any person with the same FBI number was arrested. (Tr. B 54-56, 68-69). Contrary to his expectation, Smith's office was never informed of McIntyre's 2009 arrest in Georgia. (*Id.*). Smith also explained that

---

[4] Smith testified that his affidavit erroneously indicated that the December 3, 2012 database search produced a rap sheet relating to McIntyre's arrest under the alias Lester Kinder. (Tr. B 42, 75).

the NCIC database does not automatically provide an arrest alert under such circumstances; rather, his office relies upon the arresting law enforcement agency to make the notification. (*Id.*).

In the days after he learned of McIntyre's 2009 arrest, Smith contacted the arresting agency to obtain the police reports and to speak with the arresting officers. (Tr. B 57-58, 76). According to Smith, he also conducted database checks using the name Lester Lamarr Kinder. (*Id.*). Smith testified that his research identified two individuals with that name, one of whom was in Rochester and was previously associated with McIntyre. (Tr. B 58-59). Smith recalled that he spoke with the prosecuting attorney about that individual. (*Id.*). The other individual was located in Georgia, and Smith requested that the address associated with the Georgia "Kinder" be investigated. (*Id.*).

In April and May 2013, Smith sent leads to USMS offices in Georgia and Alabama to follow up on the information he had acquired. (Tr. B 59-60; G. Ex. 2 at ¶ 6). By June 2013, those offices reported that attempts to locate McIntyre through further investigation, including surveillance, computer searches and family interviews, had been unsuccessful. (*Id.*). Approximately seven months later, on March 6, 2014, Smith interviewed a confidential informant about McIntyre and performed database checks the following day. (Tr. B 60-61; G. Ex. 2 at ¶ 6).

In June 2014, Smith performed more database checks concerning McIntyre and asked the USMS office in the Northern District of Georgia to investigate the address where McIntyre had been arrested in December 2009 using the Kinder alias. (Tr. B 61; G. Ex. 2 at ¶ 6). He also sent a letter to the Sheriff's Office in Volusia County, Florida to request records. (*Id.*).

7

On July 3, 2014, the USMS in Georgia responded that their investigation into the leads supplied by Smith had not resulted in McIntyre's arrest. (*Id.*).

In July 2014, Smith obtained information that McIntyre's father might be living in Lakeland, Florida and that McIntyre might be located there or in Sandford, Florida. (Tr. B 61-62; G. Ex. 2 at ¶ 6; D. Ex. 1 at 1016). Smith asked the USMS Florida Regional Fugitive Task Force to attempt to locate McIntyre at those locations. (*Id.*).

In October 2014, Smith spoke with DEA personnel concerning a confidential informant who had information relating to McIntyre. (Tr. B. 61-62, 68; G. Ex. 2 at ¶ 6). Approximately six months later, in April 2015, Smith obtained additional information from the DEA about McIntyre and conducted additional database research. (*Id.*).

McIntyre was arrested by RPD on December 24, 2015. (*Id.*). According to Smith, McIntyre fled from the police and was arrested after a struggle. (Tr. B 62; *see also* Docket # 24-2 at 4). During the booking process, McIntyre identified himself with his brother's name, but his fingerprints confirmed his identity. (Tr. B 62-63; *see also* Docket # 24-2 at 4). RPD contacted Smith's office to advise of McIntyre's arrest. (Tr. B 68).

Smith testified that, in addition to the efforts described above, his office participated in "a lot of surveillance conducted at different addresses" during the course of their investigation to try to locate McIntyre. (Tr. B 65-66, 80; G. Ex. 2 at ¶ 6). According to Smith, he also learned from various confidential informants during his investigation that McIntyre had changed his appearance and may have burned his fingerprints in order to avoid detection. (Tr. B 71-72). Smith acknowledged that McIntyre was well-known in the Rochester community, and Smith testified that he frequently – "probably daily" – questioned individuals who might have been familiar with McIntyre for information regarding his whereabouts. (Tr. B 84, 87-88).

8

**REPORT & RECOMMENDATION**

McIntyre seeks dismissal of the indictment on the grounds that his Sixth Amendment right to a speedy trial was violated by the approximately eight-year delay between the filing of the indictment on October 23, 2007 and his eventual arrest and same-day arraignment on December 24, 2015. (Docket ## 21-1 at ¶¶ 21-41; 45). The government opposes the motion, although it concedes that the delay between the filing of the indictment and McIntyre's arrest was "presumptively prejudicial." (Docket ## 24 at 5-12; 49).

As an initial matter, because the delay at issue occurred while the indictment was under seal, it is not clear whether the dispute is properly analyzed as a Sixth Amendment violation or a due process violation. The Second Circuit has held that the Sixth Amendment right to a speedy trial attaches only after the unsealing of a sealed indictment. *See United States v. Watson*, 599 F.2d 1149, 1156 & n.5 (2d Cir.) ("the speedy trial right under the Sixth Amendment attaches not when a sealed indictment is filed but when it is unsealed (or when the [g]overnment arrests the defendant or otherwise apprises him of the charges against him)"), *opinion amended on reh'g on other grounds*, 690 F.2d 15 (2d Cir. 1979), *opinion modified sub nom. on reh'g on other grounds*, *United States v. Muse*, 633 F.2d 1041 (2d Cir. 1980), *cert. denied*, 450 U.S. 984 (1981). As the Court reasoned in *Watson*, where the constitutional challenge concerns the delay between the sealing and unsealing of the indictment, the challenge arises under the Due Process Clause. *See id*. at 1156 n.5 ("[i]n order to challenge the delay between the sealing and unsealing of the indictment, the defendant must look . . . to the Due Process Clause").

Subsequent Supreme Court authority has called into question the continued validity of *Watson*. *Compare United States v. Leaver*, 358 F. Supp. 2d 255, 268 (S.D.N.Y. 2004)

9

("*Doggett* [*v. United States*, 505 U.S. 647 (1992)] thus explicitly denies the underlying premise of *Watson*, that the 'major evils' against which the Sixth Amendment protects are anxiety to the accused and public obloquy[;] . . . *Watson* is thus incompatible with the subsequent practice of this Circuit, and with more recent Supreme Court authority") *with United States v. Cherico*, 769 F. Supp. 2d 560, 570-71 (S.D.N.Y. 2011) ("[t]he notion that *Doggett* overruled the holding in *Watson* is, as far as I can tell, simply wrong[;] . . . [t]he Second Circuit has never expressly overruled or even criticized *Watson*, it thus remains controlling precedent and so binds this court"). Despite this apparent disagreement, the Second Circuit recently cited *Watson* with approval for the proposition that the Sixth Amendment is triggered "by the unsealing of a sealed indictment." *United States v. Moreno*, 789 F.3d 72, 78 (2d Cir. 2015).

In any event, critical to the analysis under either the Sixth Amendment or the Due Process Clause is the issue of whether the pre-arrest delay prejudiced the defendant. *See*, *e.g.*, *United States v. Moreno*, 789 F.3d at 81 ("[e]xcessive pretrial delay can inflict three kinds of cognizable prejudice: (i) oppressive pretrial incarceration, (ii) anxiety and concern of the accused, and (iii) the possibility that the defense will be impaired[;] . . . [o]f these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system") (internal quotations and citations omitted); *United States v. Watson*, 599 F.2d at 1156 n.5 ("the Due Process Clause remains a protection during this period, . . . at least where there is substantial prejudice and delay was an intentional device for prosecutorial advantage"). For the reasons explained below, even assuming the Sixth Amendment attached upon the filing of the sealed indictment, I conclude that dismissal is not warranted as evaluation of the relevant factors leads me to conclude that no violation has occurred. *See United States v. Williams*, 2017 WL 1065555, *6 (6th Cir. 2017) ("because the

10

remaining . . . factors largely weight against [defendant], we see no need to decide whether the right to a speedy trial attaches before or after an indictment is unsealed"). For similar reasons, I conclude that McIntyre has not met the heavy burden to sustain a claim for a due process violation, which requires a showing of "substantial prejudice" and that the "delay was an intentional device for prosecutorial advantage." *See Watson*, 599 F.2d at 1156 n.5; *see also United States v. Ciraulo*, 486 F. Supp. 1125, 1129 (S.D.N.Y. 1980) (defendant failed to establish that the delay between the filing of the indictment and its unsealing violated his due process rights where he did not demonstrate "substantial actual prejudice" and where government "met its burden of showing strong prosecutorial interest").

The Sixth Amendment provides, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. In evaluating a defendant's motion to dismiss an indictment on speedy trial grounds, courts balance four factors: "[the] length of delay, the reason for the delay, the defendant's assertions of his right, and prejudice to the defendant." *See Moreno*, 789 F.3d at 78 (bracket omitted) (quoting *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). The length of the delay is a threshold consideration that triggers evaluation of the remaining three factors only upon a finding that the "delay is so long as to be 'presumptively prejudicial.'" *Id.* (quoting *Doggett v. United States*, 505 U.S. at 652). "Once an analysis is triggered, no one factor is 'a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial,' and all 'must be considered together with such other circumstances as may be relevant.'" *Id.* (quoting *Barker v. Wingo*, 407 U.S. at 533).

This case involves a delay of approximately eight years between the filing of the sealed indictment and McIntyre's arrest. As conceded by the government, a delay of such length is presumptively prejudicial and requires consideration of the remaining factors. *See Moreno*,

789 F.3d at 78 (delay of twenty-seven months sufficient to trigger analysis; "we agree with the district court that the length of delay was sufficient to trigger a Sixth Amendment analysis"); *United States v. Vassell*, 970 F.2d 1162, 1164 (2d Cir.) ("[i]t comes as no surprise that courts have been unable to define 'presumptively prejudicial'[;] [o]ne commentator discerns a general consensus that a delay of over eight months meets this standard"), *cert. denied*, 506 U.S. 1009 (1992); *United States v. Blanco*, 861 F.2d 773, 778 (2d Cir. 1988) (delay exceeding ten years "is presumptively prejudicial and thus triggers an inquiry into the other three factors"), *cert. denied*, 489 U.S. 1019 (1989); *Rayborn v. Scully*, 858 F.2d 84, 89 (2d Cir. 1988) (delay of seven years between arrest warrant and conviction triggered analysis; "because the amount of elapsed time between issuance of an arrest warrant and conviction was so substantial, at trial the government was required to justify the delay in order to defeat the defendant's speedy trial claim"), *cert. denied*, 488 U.S. 1032 (1989); *United States v. Ramos*, 420 F. Supp. 2d 241, 246 (S.D.N.Y. 2006) ("[a]s the government does not dispute that the five and a half year delay in this case is presumptively prejudicial, an examination of the remaining factors is required").

I turn next to the second factor – the reason for the delay. Although no single factor is determinative, the reason for the delay is often "critical" to the analysis. *Moreno*, 789 F.3d at 79. This factor focuses on the conduct of both the defendant and the government and examines which party is "more to blame for th[e] delay." *United States v. Ramos*, 264 F. App'x 57, 59 (2d Cir.) (quoting *Doggett*, 505 U.S. at 651), *cert. denied*, 553 U.S. 1102 (2008). Any claim that the government has violated an individual's right to a speedy trial "is seriously undermined when the defendant, and not the government, is the cause of the delay." *United States v. Blanco*, 861 F.2d at 778. At the same time, any "delay stemming from deliberate government misconduct weighs heavily in favor of finding a violation." *Moreno*, 789 F.3d at 79.

12

The government has the duty to "make a diligent, good faith effort to bring a defendant to trial promptly[,]" *Blanco*, 861 F.2d at 778, which encompasses "an obligation to exercise due diligence in attempting to locate and apprehend the accused," *Moreno*, 789 F.3d at 79. Any delay resulting from the government's failure to act with reasonable diligence to apprehend the accused will weigh against the government, "although not to the same degree as deliberate misconduct." *Id*. In evaluating the government's diligence, courts consider the information known to the government at the time and whether any negligence by the government actually lengthened the delay. *Id.* at 79-80. Further, "if the government acted with diligence during some period of the delay, only periods of the delay attributable to negligence should be weighed against the government." *Id*. at 80.

McIntyre argues that the government is responsible for the delay in this case because no evidence exists that McIntyre was aware that he had been indicted and was attempting to evade arrest. (Docket ## 21-1 at ¶¶ 31, 33-35; 29 at ¶¶ 35-39). McIntyre also contends that the government's efforts fell short of reasonable diligence because it relied solely on Smith to try to apprehend McIntyre. (Docket ## 29 at ¶¶ 11-27; 45). I disagree.

First, the government has presented credible evidence from which it may reasonably be inferred that McIntyre was aware of the potential charges against him and was attempting to evade prosecution. The indictment arises out of an alleged drug transaction that occurred on October 3, 2007. (Docket ## 21 at ¶ 10; 24 at 3). Prior to that date, McIntyre was on supervised release and was required to report to the probation office within the first five days of each month. (Docket # 24 at 3). McIntyre reported as required on September 4, 2007, as he had apparently done for the previous three years. (Docket ## 24 at 3, 7; 29 at ¶ 21). During the October 3, 2007 incident, McIntyre fled the scene, abandoned his vehicle, and ran away; others

13

who had arrived with McIntyre were detained at the scene. (Docket ## 21-1 at ¶¶ 17-18; 24 at 3). Thereafter, McIntyre failed to report to the probation office as required in October 2007 or at any time before his December 2015 arrest. (Docket # 24 at 3). McIntyre's flight from the scene, and his failure to comply with supervised release requirements that he had satisfied previously, strongly suggest that McIntyre anticipated and sought to evade the possibility of criminal charges arising from the October 3, 2007 incident.

The record also demonstrates that McIntyre used several aliases during the period between the indictment and his arrest. The testimony establishes that McIntyre used the "Kinder" alias when he was arrested in Georgia in 2009. Further, McIntyre used his brother's name when he was arrested in December 2015. This use of aliases, coupled with McIntyre's flight from the scene and his failure to comply with his supervised release conditions, supports a finding that McIntyre was attempting to avoid detection by law enforcement authorities. *See Blanco*, 861 F.2d at 779-80 (district court's finding that defendant knew of pending indictment and was attempting to avoid apprehension and prosecution not clearly erroneous where she used alias, told informant she would not return to United States because she was "wanted," and her close associates and co-conspirators had been convicted; "[a] true fugitive, whose location is unknown, or who is successfully resisting government efforts to bring him into the jurisdiction, will not be able to obtain dismissal of an indictment") (quoting *United States v. Salzmann*, 548 F.2d 395, 404 (2d Cir. 1976) (Feinberg, C.J., concurring)); *United States v. Valiente-Mejia*, 2009 WL 3401210, *8 (S.D.N.Y. 2009) ("a court is entitled to consider heavily against the defendant the fact that he attempted to conceal his whereabouts while he was a fugitive by using a false name and false identification") (internal quotation omitted); *United States v. Sanchez*, 1989 WL 25240, *2 (S.D.N.Y. 1989) (evidence demonstrated that defendant took affirmative steps to

avoid detection by changing residence and ceasing communications with his attorney and the United States Attorney's Office regarding surrender; "[s]ince this court is convinced that [d]efendant affirmatively sought to avoid detection and arrest by federal officials, he must bear the primary responsibility for the lengthy delay between his indictment and trial").

I further find that the government used reasonably diligent efforts to locate and apprehend McIntyre during the period between his indictment and arrest. Soon after the supervised release warrants issued, they were entered into the NCIC database, and Smith testified that he continued to conduct periodic database checks throughout the entire period that McIntyre was at large. In addition, Smith and other members of law enforcement interviewed confidential sources and other individuals associated with McIntyre to solicit information about McIntyre's whereabouts, and they followed up with law enforcement agencies in other districts on leads they obtained. Smith and other members of law enforcement conducted surveillance on various locations where information suggested that McIntyre might be located. McIntyre's case was publicized on a television program in an attempt to obtain information as to his whereabouts, and the tips that were generated were investigated. Smith also obtained telephone records for a number suspected to be used by McIntyre or his associates. After he learned information that McIntyre may have used the alias "Kinder," Smith investigated that alias and locations associated with that name.

I find that these efforts satisfied the government's obligation to employ reasonably diligent and good faith efforts to locate McIntyre and bring him to justice. *See United States v. Ramos*, 264 F. App'x at 60 (government exercised diligence by interviewing informants and co-conspirators, conducting surveillance of defendant's apartment, entering and maintaining defendant's information on three separate databases, and promptly pursuing

15

defendant once identified through a NCIC database check); *Blanco*, 861 F.2d at 778 (government's efforts, including investigating defendant's whereabouts, attempting to track defendant through informant, entering fugitive report in database, creating passport and visa "lookouts," and following up on leads, were sufficient to meet its constitutional obligations); *United States v. Valiente-Mejia*, 2009 WL 3401210 at *10, 11 ("[g]overnment employed a constitutionally sufficient level of diligence" throughout the period of delay where it "entered defendant's information into a number of standard law enforcement databases," tracked and surveilled addresses used by defendant, and searched and monitored databases for information on defendant and his family).

McIntyre maintains that the government's efforts were insufficient because it assigned primary responsibility for locating McIntyre only to Smith. (Docket # 45). I agree with the government that no authority exists for the proposition that more than one law enforcement agent or agency must take responsibility for locating a fugitive. In any event, the record demonstrates that although Smith led the efforts to locate McIntyre, several other government agencies participated in those efforts, including the United States Attorney's Office, the DEA, state law enforcement offices, and USMS offices located in other districts. Although the government conceivably could have undertaken other actions to locate McIntyre during the years before his arrest, the law does not require the government to employ every possible effort to apprehend a fugitive. *See Rayborn v. Scully*, 858 F.2d at 90 ("while a defendant's status as a fugitive will not relieve the [government] of its sixth amendment obligations, law enforcement officials are not expected to make heroic efforts to apprehend a defendant who is purposefully avoiding apprehension or who has fled to parts unknown"). Rather, the government is required

to do no more and no less than to make "a diligent, good faith effort to bring [the defendant] to trial promptly." *Blanco*, 861 F.2d at 778. I find that the government did so here.

Turning to the third factor, McIntyre clearly asserted his right to a speedy trial in connection with his omnibus motions. (Docket # 21). Yet, as described in detail above, I find that McIntyre engaged in conduct designed to avoid apprehension on the pending charges. Although it is theoretically possible that he was unaware of the pending charges (Docket # 29 at ¶¶ 35-39), it is more plausible that McIntyre anticipated having to face charges arising from the October 2007 drug transaction in the event he were located. Under these circumstances, this factor does not weigh in McIntyre's favor. *See Ramos*, 264 F. App'x at 60 ("the district court acted within its discretion in lightly taxing against [defendant] the two-year interval between his arrest and assertion of his right, while also acknowledging that [defendant] may have been unaware of his right to a speedy trial"); *Blanco*, 861 F.2d at 780 ("[because] the bulk of the delay of which [defendant] is complaining occurred between her indictment in 1975 and her arrest in 1985, and she only asserted her claim after her arrest, this factor does not help her case"); *Rayborn*, 858 F.2d at 92-93 ("[defendant's] status as a bail jumper, absconder, and fugitive during much of the eighty-six months of delay weighs heavily against him in our analysis of his speedy trial claim[;] . . . we agree with the district court that [defendant] simply raised his protests too lamely and too late") (internal quotations omitted).

Finally, I turn to the last factor – the prejudice to the defendant. McIntyre was not incarcerated during the eight-year delay and nothing in the record suggests that the delay caused him any undue anxiety; rather, he claims his ability to defend himself has been prejudiced by the passage of time. (Docket ## 21-1 at ¶¶ 39-40). As noted by the government (Docket # 24 at 6), although a delay may be lengthy enough to be "'presumptively prejudicial,' (*i.e.* long enough to

17

trigger a Sixth Amendment inquiry),'" that does not mean that the delay was necessarily long enough to cause "'presumptive prejudice' (*i.e.* prejudice that need not be specifically shown)." *Moreno*, 789 F.3d at 78 n.3, 81 ("[d]elay does not per se prejudice the accused's ability to defend himself because the government bears the burden of proof when the case comes at last to trial") (internal quotations omitted). This case is not so extraordinary as to warrant a finding of prejudice based solely upon the passage of time. *See id.* at 82 ("[t]his is not one of those exceedingly rare instances in which the length of delay alone supports a showing of prejudice"); *Valiente-Mejia*, 2009 WL 3401210 at *13 ("[defendant] is correct that in certain cases of serious negligence, defendants may be relieved of the obligation to demonstrate particularized prejudice[,] [b]ut the [c]ourt does not find this to be one of those cases").

        McIntyre's assertion that his defense may have been impaired by the passage of time (Docket # 21-1 at ¶ 40 ("[t]hat prejudice is the possibility that his defense will be impaired by loss of evidence, faded memory of events (including his own . . .), and inability to obtain favorable evidence") is wholly conclusory and insufficient to demonstrate prejudice. *Blanco*, 861 F.2d at 780 ("[because] delay can just as easily hurt the government's case, [defendant's] general claim that the delay impaired her defense . . . lacks force"); *Rayborn*, 858 F.2d at 94 ("courts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice"); *United States v. Ramos*, 420 F. Supp. 2d at 252 ("[d]efendant's heavy reliance on presumptive prejudice would be considerably more compelling if the [g]overnment was primarily responsible for the delay, or was responsible for a greater portion of the delay[;] [b]ecause this [c]ourt has found that the [g]overnment is only minimally to blame for the delay, the presumption of prejudice is correspondingly weakened"). Accordingly, this factor also favors a finding that McIntyre's speedy trial rights were not violated.

Based upon my evaluation of each of the factors relevant to the Sixth Amendment analysis under *Barker*, I conclude that McIntyre's right to a speedy trial was not violated by the delay between the filing of the indictment and his arrest and arraignment. Similarly, I conclude that there was no due process violation stemming from the delay as McIntyre has not established "substantial prejudice" or intentional delay on the part of the government. *See Watson*, 599 F.2d at 1156 n.5.

## CONCLUSION

For the reasons stated above, I recommend that the district court deny McIntyre's motion to dismiss the indictment on the grounds that his speedy trial rights have been violated. (Docket # 21).

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       May 5, 2017

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                                          *s/Marian W. Payson*
                                                          MARIAN W. PAYSON
                                                   United States Magistrate Judge

Dated: Rochester, New York
        May 5, 2017

---

[5] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).